[No. A045593. First Dist., Div. One. Jan. 14, 1991.]

RICHARD URBANIAK, as Administrator, etc., Plaintiff and Appellant, v.
FREDERIC H. NEWTON et al., Defendants and Respondents.

## COUNSEL

Alice Philipson, Bien, Summers & Dale and E. Elizabeth Summers for Plaintiff and Appellant.

O'Connor, Cohn, Dillon & Barr, Duncan Barr, Susan J. Reifel, Lynch, Loofbourrow, Helmenstine, Gilardi & Grummer, Robert T. Lynch and Daniel F. McLennon for Defendants and Respondents.

## OPINION

**NEWSOM, J.**—On October 2, 1987, Gary Urbaniak (hereafter Urbaniak), filed a first amended complaint in the Superior Court of San Francisco against Frederic H. Newton, M.D., Frederick H. Newton, M.D., a Medical Corporation (hereafter Dr. Newton), John J. Parente, Paul D. Karasoff, and Allianz Insurance Co. (hereafter collectively respondents) seeking damages for dissemination of a medical report which disclosed that he had tested positive for the HIV virus. The complaint was based on a series of distinct legal theories including invasion of the right to privacy guaranteed in article I, section 1, of the California Constitution, violation of Health and Safety Code section 199.21, intentional infliction of emotional distress and negligent infliction of emotional distress. In their answer, respondents raised the affirmative defense, among others, that the dissemination of the report was privileged under Civil Code section 47 as a publication in a judicial proceeding.

The trial court granted respondents' motion for summary judgment and a judgment of dismissal was filed on January 13, 1989. During the pendency of this appeal, Urbaniak died, and the Estate of Gary Urbaniak was substituted as appellant.

In September 1984, while working as a machine operator for a San Francisco business, Urbaniak suffered a head injury with secondary neck and back strain. The injury marked the onset of disabling head and back pain that prevented him from retaining any form of gainful employment. He complained of headaches, shoulder pain, midback pain, and numbness and tingling in the fingers of his right hand. With the representation of

counsel, he brought a workers' compensation action in mid-1985 against his former employer. The employer's insurance carrier, Allianz Insurance Co., retained the law firm of John J. Parente for defense of the action. In February 1986, Paul D. Karasoff, an associate in Parente's firm, made arrangements through Urbaniak's counsel for a medical examination by a neurologist, Dr. Newton, employed for this purpose by Allianz Insurance Co. On his counsel's advice, Urbaniak consented to the examination.

In the course of the neurological examination, Dr. Newton fastened reusable metal electrodes with sharp points to Urbaniak's body. The devices drew blood, as they occasionally do. After the examination, Urbaniak disclosed that he had tested positive for the HIV virus. He and Dr. Newton offered sharply differing accounts of what was said; but since a motion for summary judgment is concerned only with identification of triable issues of fact, it is only Urbaniak's testimony that is relevant to this appeal. (Code Civ. Proc., § 437c.)

According to Urbaniak, he was concerned that traces of blood on the electrodes could lead to the infection of other persons. Just before he left the office after the examination, he struck up a conversation with Dr. Newton's nurse—"[j]ust a very brief one, to tell her that I don't want this on my report . . . and that she needed to be careful sterilizing it, or when she sterilized it, the probes . . . . Because my HTLV-III test was positive." He explained, "I felt morally obligated to tell a medical technician the fact that my HTLV-III came out positive so she could sterilize the materials she was using, meaning the metal probes." Upon receiving this information, the nurse replied, "I will be back in a minute," and left the room. She returned shortly but did not mention the matter. Urbaniak insisted that he never spoke directly to Dr. Newton about his HIV blood test.

In his report on the examination, Dr. Newton mentioned Urbaniak's status as an AIDS victim as a possible source of muscle tension that might account for his symptoms. Discounting the possibility that the symptoms were caused by the work injury, the report stated: "It seems more probable that, psychosocial, characterological or other factors played a significant role in the accentuation of symptomatology. Here it is worth noting that the patient informed me that he has been diagnosed as HLV-III positive. It would not be surprising that under the circumstances of concerns about potentially serious health matters, he might have some increase in symptomatology due to increased muscle tension."

Dr. Newton sent one copy of the report to Paul D. Karasoff, who in turn sent copies to Urbaniak's counsel and Allianz Insurance Company, where it was handled by at least seven employees. John J. Parente consulted the

report, and his secretary sent a copy to the Workers' Compensation Appeals Board. Upon determining that Urbaniak was no longer entitled to compensation for chiropractic treatments, Allianz later sent an additional copy of the report to Urbaniak's chiropractor as justification for terminating payments.

■ Appellant urges that the record presents a triable issue of fact with respect to the third cause of action alleging invasion of privacy under article I, section 1, of the California Constitution (hereafter article I, section 1).[1]

Denying any factual basis for an invasion of privacy, respondents point out that, in the absence of special circumstances, there is no confidential physician-patient relationship in a medical examination of a plaintiff arranged for the benefit of the defense. Urbaniak's counsel presumably advised him to cooperate with the examination only because the defense could have secured an order compelling his compliance under Code of Civil Procedure section 2032. The examination served as a discovery tool, and Urbaniak submitted to it in a strictly adversarial context. (*Mercury Casualty Co.* v. *Superior Court* (1986) 179 Cal.App.3d 1027, 1033 [225 Cal.Rptr. 100].) ■ In a discovery proceeding, the examining physician owes the claimant no duty of care (*Keene* v. *Wiggins* (1977) 69 Cal.App.3d 308, 315 [138 Cal.Rptr. 3]), and the claimant has a right to have his own counsel present during the examination. (*Jorgensen* v. *Superior Court* (1958) 163 Cal.App.2d 513, 516 [329 P.2d 550].) And, while an examining physician might indeed incur liability by disclosing confidential information irrelevant to the purpose of the examination, such liability cannot be predicated on invasion of privacy in the absence of special circumstances indicating that the information was given in a confidential communication between patient and physician.

The asserted right of privacy here must be premised on the peculiar circumstances of Urbaniak's disclosure to Dr. Newton's nurse. According to his testimony, he revealed his HIV positive status at a time and for a purpose that had no connection with the medical examination for his workers' compensation case. The examination had been completed; he had been asked nothing and had revealed nothing about his illness. He chose to disclose his HIV positive status solely to alert the nurse to the need to take precautions in handling electrodes contaminated with his blood. ■ Thus, the issue is whether a right to privacy arises in the disclosure of HIV positive status to a health care worker for the purpose of alerting the

---

[1] The first amended complaint also alleged causes of action for tortious invasion of privacy and violation of the right of privacy under the United States Constitution, but appellant has abandoned these theories on appeal.

worker to the need for taking safety precautions in handling medical implements contaminated with infected blood. We conclude that it does.[2]

As amended in 1972, article I, section 1, includes "privacy" among the inalienable rights guaranteed all citizens. ■ "The constitutional provision is self-executing; hence, it confers a judicial right of action on all Californians." (*Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 829 [134 Cal.Rptr. 839]; *White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222].) "And it has been held the state privacy right protects against invasions of privacy by private citizens as well as the state." (*Chico Feminist Women's Health Center* v. *Scully* (1989) 208 Cal.App.3d 230, 242 [256 Cal.Rptr. 194]; *Park Redlands Covenant Control Committee* v. *Simon* (1986) 181 Cal.App.3d 87, 98 [226 Cal.Rptr. 199].)

Although the state right of privacy has been held to be broader than the federal right (*Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 281 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]), California courts construing article I, section 1, have looked for guidance to federal precedents. (E.g., *Fults* v. *Superior Court* (1979) 88 Cal.App.3d 899, 903 [152 Cal.Rptr. 210].) We see some relevance in a line of United States Supreme Court decisions that has recognized the sensitivity "in terms of privacy interests" of a person's sexual practices. (See *Jones* v. *Superior Court* (1981) 119 Cal.App.3d 534, 549-550 [174 Cal.Rptr. 148], and cases collected therein.) Since in the popular mind AIDS is commonly conceived as a social disease suggestive of forms of sexual conduct, these precedents have at least an indirect bearing on the right to privacy attaching to disclosure of HIV positive status.

California courts construing article I, section 1, have noted other privacy interests having some parallel to the present case. In *Cutter* v. *Brownbridge* (1986) 183 Cal.App.3d 836 [228 Cal.Rptr. 545], we held that the provision protects the privacy of disclosures to a psychotherapist, and a line of cases has held that confidential medical records come within its purview. (*Binder* v. *Superior Court* (1987) 196 Cal.App.3d 893, 900 [242 Cal.Rptr. 231]; *Wood* v. *Superior Court* (1985) 166 Cal.App.3d 1138, 1147 [212 Cal.Rptr. 811]; *Jones* v. *Superior Court, supra,* 119 Cal.App.3d at p. 546; *Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669, 678-679 [156 Cal.Rptr. 55].)

---

[2] The parties have devoted much of their briefs to the issue of waiver, but our analysis is based entirely on evidence that Urbaniak disclosed his HIV positive test results to Dr. Newton's nurse, after requesting confidentiality, for the purpose of alerting her to the need to take safety precautions in handling the electrodes. In this narrow factual context, we see no reasonable basis for inferring waiver.

Perhaps more pertinent are decisions construing the zone of privacy protected by the Fourth Amendment from unreasonable governmental intrusion. ■ State and federal decisions stemming from *Katz* v. *United States* (1967) 389 U.S. 347, 350-352 [19 L.Ed.2d 576, 581-582, 88 S.Ct. 507], have established that "[t]he basic test as to whether there has been an unconstitutional invasion of privacy is whether the person has exhibited a subjective expectation of privacy which is objectively reasonable and, if so, whether that expectation has been violated by unreasonable governmental intrusion." (*Jacobs* v. *Superior Court* (1973) 36 Cal.App.3d 489, 493-494 [111 Cal.Rptr. 449]; *People* v. *Bradley* (1969) 1 Cal.3d 80, 84-86 [81 Cal.Rptr. 457, 460 P.2d 129].) One California decision has stated in dicta that this reasonable expectations test is also the "basic test" of violation of the right to privacy under article I, section 1. (*Armenta* v. *Superior Court* (1976) 61 Cal.App.3d 584, 588 [132 Cal.Rptr. 586].) Whether or not it should be so regarded, the reasonable expectations test of these Fourth Amendment precedents may be read as at least establishing a criterion, relevant to certain categories of cases, for recognizing a right to privacy protected under the California Constitution.[3] (See *Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652, 656 [125 Cal.Rptr. 553, 542 P.2d 977] ["'reasonable expectation of privacy'"].)

Shortly after passage of the 1972 amendment which added the right of privacy to article I, section 1, the Supreme Court in *White* v. *Davis, supra,* 13 Cal.3d at p. 773, relied heavily on the election brochure argument as an aid to construing the provision, noting that it is the only legislative history available. Among other things, the brochure stated: "This simple amendment will extend various court decisions on privacy to insure protection of our basic rights." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elect. (Nov. 7, 1972) rebutted to argument against Prop. 11, p. 28.) Several cases have relied on this statement in construing the provision. (*Porten* v. *University of San Francisco, supra,* 64 Cal.App.3d at p. 829; *Jones* v. *Superior Court, supra,* 119 Cal.App.3d 534, 546; *Central Valley Ch. 7th Step Foundation, Inc.* v. *Younger* (1989) 214 Cal.App.3d 145, 160 [262 Cal.Rptr. 496].) ■ The statement indicates that the interests traditionally embraced by the tort of invasion of privacy now come within the protection of article 1, section 1, although the limits of the tort cause of action do not necessarily represent limits to an action taken for violation of the constitutional right.

Among the several distinct forms of tortious invasion of privacy, the form closest to the case at bar consists of "public disclosure of true, embarrassing

---

[3] See criticisms of the reasonable expectations test in Gerstein, *California's Constitutional Right to Privacy: The Development of the Protection of Private Life* (1982) 9 Hastings Const.L.Q. 385; Comment, *A Taxonomy of Privacy: Repose, Sanctuary, and Intimate Decision* (1976) 64 Cal.L.Rev. 1447.

private facts about the plaintiff." (*Porten* v. *University of San Francisco, supra*, 64 Cal.App.3d at p. 828.) ■ As described in *Diaz* v. *Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118, 126 [188 Cal.Rptr. 762], "the public disclosure tort contains the following elements: (1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern." These criteria are now relevant to a cause of action under article I, section 1.

While tortious invasion of privacy requires a "public disclosure," a cause of action under article I, section 1, may be based on a more extensive, if still somewhat amorphous, concept of "improper use of information properly obtained." In *White* v. *Davis, supra*, 13 Cal.3d at page 775, the Supreme Court observed that the election brochure identified "the principal 'mischiefs' at which the amendment is directed." The third of these was "the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party . . . ." ■ ■■■ *Porten* v. *University of San Francisco, supra*, 64 Cal.App.3d 825 holds that this purpose of the constitutional amendment creates a cause of action broader than that allowed under tort principles.[4]

In the *Porten* case, the complaint alleged that the defendant had without permission disclosed a portion of the plaintiff's academic record to a state scholarship commission. Reviewing a judgment of dismissal on demurrer, the court agreed that the complaint failed to state a tort cause of action for "public disclosure of private facts" since the disclosure to the state commission "was not a communication to the public." (*Porten* v. *University of San Francisco, supra*, 64 Cal.App.3d at p. 828.) It held, however, that the complaint stated a "prima facie violation of the state constitutional right of privacy" based on "the improper use of information properly obtained for a specific purpose." (*Id.* at p. 832.)

California decisions have applied the concept of "improper use of information properly obtained" to overly broad dissemination of arrest data (*Central Valley Ch. 7th Step Foundation, Inc.* v. *Younger, supra*, 214 Cal.App.3d at p. 161; *Central Valley Chap. 7th Step Foundation* v. *Younger* (1979) 95 Cal.App.3d 212, 236 [157 Cal.Rptr. 117]), to the posting of a personnel action memorandum in a public place (*Payton* v. *City of Santa*

---

[4]While article I, section 1, does not require "public disclosure," some kind of overt disclosure is inherent in the concept of invasion of privacy. The question remains whether a disclosure is sufficiently overt to violate a constitutionally protected interest in privacy. Whatever may be the general standard for resolving this issue, we note that decisions under article I, section 1, indicate that a disclosure for purpose of litigation may give rise to a cause of action under article I, section 1. (*Valley Bank of Nevada* v. *Superior Court, supra*, 15 Cal.3d 652; *Cutter* v. *Brownbridge, supra*, 183 Cal.App.3d 836.)

*Clara* (1982) 132 Cal.App.3d 152, 154 [183 Cal.Rptr. 17]), and, most pertinent to the present case, to a psychotherapist's disclosure of confidential communications of a patient. (*Cutter* v. *Brownbridge, supra,* 183 Cal.App.3d at pp. 841-844.) Our holding in *Cutter* drew support from *In re Lifschutz* (1970) 2 Cal.3d 415 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1], the decision that first recognized a constitutional right of privacy under California law.

In the *Lifschutz* case, a psychiatrist sought a writ of habeas corpus after he was imprisoned for contempt of court for refusing in discovery proceedings to divulge communications of a former patient. The propriety of his refusal turned on the patient-litigant exception to the psychotherapist-patient privilege. The Supreme Court interpreted the exception in light "of the justifiable expectations of confidentiality that most individuals seeking psychotherapeutic treatment harbor . . . . ' "The psychiatric patient confides more utterly than anyone else in the world . . . . It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say—may be revealed to the whole world from a witness stand." ' " (*In re Lifschutz, supra,* 2 Cal.3d at p. 431.) The court proceeded to hold that the patient's interest in preserving the confidentiality of these private revelations was not only protected by statute but "draws sustenance from our constitutional heritage. In *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 484 [14 L.Ed.2d 510, 517, 85 S.Ct. 1678], the United States Supreme Court declared that 'Various guarantees [of the Bill of Rights] create zones of privacy,' and we believe that the confidentiality of the psychotherapeutic session falls within one such zone." (2 Cal.3d at pp. 431-432.)

■ The right to privacy recognized in the *Cutter* and *Lifschutz* decisions is congruent with the reasonable expectations test found in Fourth Amendment cases. The significance of the patient's reasonable expectations in this context lies in the public interest in encouraging confidential communications within a proper professional framework. By enforcing the patient's reasonable expectations of privacy, the courts will both encourage free communication needed for an effective professional relationship and protect the relationship from abuse.

*Board of Medical Quality Assurance* v. *Gherardini, supra,* 93 Cal.App.3d 669 relied on similar considerations in holding that article I, section 1, protects the confidentiality of medical records. The court observed that under California statutes "[t]he patient-physician privilege (Evid. Code, §§ 990-1007) creates a zone of privacy whose purposes are (1) 'to preclude humiliation of the patient that might follow disclosure of his ailments' [citations] and (2) to encourage the patient's full disclosure to the physician

of all information necessary for effective diagnosis and treatment of the patient. [Citations.]" (*Id*. at pp. 678-679.) Holding that this zone of privacy is now entitled to constitutional protection under article I, section 1, the court reasoned, "The patient should be able to rest assured with the knowledge that 'the law recognizes the communication as confidential and guards against the possibility of his feelings being shocked or his reputation tarnished by their subsequent disclosure.' . . . The *reasonable expectation* that such personal matters will remain with the physician are no less in a patient-physician relationship than between the patient and psychotherapist." (*Id*. at p. 679, italics added.)

We will now apply this lengthy exposition of California law of privacy to the case at bar. There can be no doubt that dislosure of HIV positive status may under appropriate circumstances be entitled to protection under article I, section 1. The condition is ordinarily associated either with sexual preference or intravenous drug uses. It ought not to be, but quite commonly is, viewed with mistrust or opprobrium. Under the test of tortious invasion of privacy, it is clearly a "private fact" of which the disclosure may "be offensive and objectionable to a reasonable [person] of ordinary sensibilities." (*Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 809 [163 Cal.Rptr. 628, 608 P.2d 716], italics omitted.) In the field of constitutional law, federal decisions concerning the right of privacy accorded to sexual practices, and California precedents dealing with the privacy attaching to medical records and the psychotherapist-patient relationship, provide judicial recognition of privacy interests in closely related areas of life.

The circumstances under which disclosure of HIV positive status may give rise to a cause of action pursuant to article I, section 1, are governed by the concept of "improper use of information properly obtained." (*White* v. *Davis, supra*, 13 Cal.3d 757, 775.) In the field of health care, disclosure of information about a patient constitutes "improper use" when it will subvert a public interest favoring communication of confidential information by violating the patient's reasonable expectations of privacy. We find such a public interest here in a patient's disclosure of HIV positive status for the purpose of alerting a health care worker to the need for safety precautions. Although Urbaniak's concern may perhaps have been groundless, it came within a wider sphere of communications between patients and health practitioners, and among health practitioners themselves, where disclosure of a patient's HIV positive status has undoubted importance for safety precautions in treatment. (See Health & Saf. Code, §§ 199.215, 199.24, & 199.33.) The evidence here would support the inference that Urbaniak reasonably

anticipated privacy.[5] By enforcing such reasonable expectations of privacy, the courts will simultaneously foster needed disclosures of HIV positive status and protect against their abuse.

As an affirmative defense, the respondents counter that the repetition of Urbaniak's statement was privileged under Civil Code section 47, subdivision 2, as a statement published in a judicial proceeding. ■ The privilege may indeed "defeat claims of invasion of privacy." (*Ribas* v. *Clark* (1985) 38 Cal.3d 355, 364 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417].) ■ We hold that it does provide a valid defense for the defendants John J. Parente, Paul D. Karasoff, and Allianz Insurance Company. They received the disclosure in a context—the report of a physician retained by the defense in discovery proceedings—that did not indicate a confidential communication, and the evidence does not reveal that they had actual notice of facts suggesting an invasion of privacy.[6] It is true that, following normal claim procedures, Allianz—over Urbaniak's objection— distributed a copy of the report to his chiropractor but the record still does not establish that at this time Allianz had received notice of the facts on which we have predicated Urbaniak's right to privacy.

■ But Civil Code section 47, subdivision 2, does not provide "blanket immunity for disclosures . . . of constitutionally protected privileged communications." (*Cutter* v. *Brownbridge, supra*, 183 Cal.App.3d at p. 847.) Where the constitutional right of privacy is at stake, the statute calls for "careful balancing" of the relevant statutory and constitutional interests. (*Ibid.*) ■ The allegations of the complaint support the inference that Dr. Newton knew of and ratified the use of the information confided to his nurse. The offending information had limited relevance to the medical examination. It would have been possible to mention the patient's concern over his health as a source of stress without specifically mentioning his HIV positive status. Under these circumstances, as in *Cutter* v. *Brownbridge, supra*, at p. 848, "[w]e have determined that the constitutional right to privacy outweighs the policies underlying the judicial proceedings immunity when private material is voluntarily published, without resort to a prior judicial determination."

■ Dr. Newton also defends on the ground that Urbaniak's cause of action abated on his death while this appeal was pending. Probate Code

---

[5] As a standard for recognizing the right to privacy, the test of reasonable expectations can sometimes be circular: expectations will be reasonable where privacy is recognized. But the patient's expectations under the actual circumstances of disclosure are still relevant to evaluating the confidential nature of the disclosure.

[6] We do not reach the issue whether Allianz is also protected by the exclusive remedy rule of Labor Code section 3602.

section 573, subdivision (c) provides: "Where a person having a cause of action dies before judgment, the damages recoverable by his or her personal representative are limited to the loss or damage the decedent sustained or incurred prior to death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived but not including any damages for pain, suffering, or disfigurement." Although the statute refers to death "before judgment," not to death while an appeal is pending, it must be taken into account in determining whether a reversal of judgment would have any practical effect. (*Consol. etc. Corp.* v. *United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [167 P.2d 725].)

Under Probate Code section 573, the Estate of Urbaniak is unquestionably barred from recovering damages for emotional distress (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 920, fn. 3 [148 Cal.Rptr. 389, 582 P.2d 980]), but it can still recover special damages, if any, and may seek punitive damages. For recovery of punitive damages, it is only required that "a tortious act be proven." (*Carr* v. *Progressive Casualty Ins. Co.* (1984) 152 Cal.App.3d 881, 892 [199 Cal.Rptr. 835]; *Weiss* v. *Blumencranc* (1976) 61 Cal.App.3d 536, 543 [131 Cal.Rptr. 298].) Since appellant still possesses a right to seek damages, Probate Code section 573 does not operate to abate the cause of action.

■ Appellant strenuously argues that the complaint also states a cause of action under Health and Safety Code section 199.21. Subdivision (a) of the statute provides: "Any person who negligently discloses results of a blood test to detect antibodies to the probable causative agent of acquired immune deficiency syndrome to any third party, in a manner which identifies or provides identifying characteristics of the person to whom the test results apply, except pursuant to a written authorization . . . shall be assessed a civil penalty in an amount not to exceed one thousand dollars ($1,000) plus court costs . . . ." Subdivision (b) provides higher penalties for "willful" disclosures, and subdivision (c) makes negligent or willful disclosures a misdemeanor under certain defined circumstances.

In a very thorough exposition of legislative history, appellant maintains that the statute should be broadly construed to effect its legislative purpose; so construed, the statute would extend to "disclosures of information received from the individual whose test results are disclosed." Taking this logic further, appellant regards the disclosure to Dr. Newton's nurse as conveying to respondents "the results of a blood test" that they could not reveal to a third party without violating the statute.

Without questioning the legislative history calling for a broad interpretation of the statute, we observe that appellant's interpretation would give the

statute an extraordinarily long reach, affecting the transmittal of information about AIDS victims in a wide variety of social contexts. This sweeping scope is not supported by the statutory language. Liability is limited to any person who "discloses results of a blood test." Health and Safety Code section 199.21, subdivision (k) defines the word disclosed as follows: " 'Disclosed,' as used in this section, means to disclose, release, transfer, disseminate, or otherwise communicate all or any part of any *record* orally, in writing, or by electronic means to any person or entity." (Italics added.) The word "record" can only refer to the record of a blood test. The statutory language, in short, appears to apply only to disclosures by persons having access to the record of the results of a blood test.

Our interpretation is favored by the legislative history. For example, the emergency provision of the statute explains that it was intended "to protect the confidentiality of persons undergoing a blood test for" AIDS and thereby "to encourage individuals who are stricken with the disease to undergo treatment . . . ." (Stats. 1985, ch. 22, § 4, p. 83.) This legislative purpose will be served only to the extent that the statute is applied to persons and institutions that conduct tests for AIDS, assume responsibility for custody or distribution of test results, or use test results in connection with treatment of affected persons.

 Lastly, we hold that the record fails to present a triable issue of fact on the theories of intentional and negligent infliction of emotional distress. An element of the tort of intentional infliction of emotional distress is "outrageous" conduct that is "beyond all bounds of decency." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 404, p. 484.) Dr. Newton's conduct cannot be characterized in such harsh terms. Mention of the HIV positive test results is justified, he claims, by his desire to indicate the high likelihood of attendant emotional stress. And while appellant may reasonably contend that the disclosure was in fact unnecessary, the record simply provides no basis for characterizing Dr. Newton's conduct as outrageous within the meaning of tort precedents.

 "Damages for severe emotional distress . . . are recoverable in a negligence action when they result from the breach of a duty owed the plaintiff . . . ." (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 590 [257 Cal.Rptr. 98, 770 P.2d 278].) Appellant here attempts to premise a duty alternatively on the foreseeability of harm and the statutory policy of Health and Safety Code section 199.21. The record does not support an inference that respondents' actions involved a foreseeable risk of "severe emotional distress," as that term has been defined. (See *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 666-668 [257 Cal.Rptr. 865, 771 P.2d 814].) They did not know of any unusual

vulnerability of appellant and limited the distribution of the report to usual channels in a workers' compensation proceeding. Appellant's alternative theory that a duty may be based on section 199.21 is based on an expansive interpretation of this statute which we earlier rejected.

The judgment dismissing the third cause of action against Dr. Newton is reversed. In all other respects, the judgment is affirmed. Costs to appellant.

Dossee, J., concurred. Racanelli, P. J., concurred in the result.