John DOE, (a pseudonym), Plaintiff,

v.

Jeffrey A. BEARD, Secretary, The California Department of Corrections and Rehabilitation; et al., Defendants.

Case No. EDCV 13–02262 DDP (Spx).

United States District Court, C.D. California.

Signed Nov. 18, 2014.

Christopher Joseph Kelly, Lynch and Kelly Ltd., Los Angeles, CA, for Plaintiff.

Danielle Rachel Hemple, CAAG—Office of Attorney General, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART THE MOTION TO DISMISS

DEAN D. PREGERSON, District Judge.

Before the Court is Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint ("TAC"). Having considered the parties' submissions, the Court adopts the following order and denies the motion.

## I. BACKGROUND

Plaintiff was a prisoner at California Institute for Men ("CIM"), which is administered by the California Department of Corrections and Rehabilitation ("CDCR"). He was and is HIV-positive. In 2012, Defendant Young (a medical technician at the prison) misplaced his medical file, which resulted in the file being delivered to another prisoner. (TAC ¶¶ 37–42.) The other prisoner kept the file and shared its contents, including Plaintiff's status as seropositive for Human Immunodeficiency Virus ("HIV") with other prisoners. (Id. at ¶ 41.) The following day Plaintiff was made aware that his file had been delivered to another prisoner when other prisoners began taunting him about it. (Id. at ¶ 44.) One said to him, "I wouldn't want to be you now that people know what you've got," which Plaintiff alleges was a "thinly veiled threat." (Id.) Plaintiff also alleges that other inmates "taunted and threatened" him. (Id. at ¶ 45.) Plaintiff alleges that he immediately sought assistance from corrections officers (Defendants Valenzuela and Nash) in retrieving the file, but the officers declined to intervene; Defendant Valenzuela allegedly told him, "I want nothing to do with that." (Id. at ¶¶ 47, 51.) Plaintiff also alleges he sought assistance from the prison psychiatrist, who contacted a corrections officer, Defendant Botello, and explained that Plaintiff's file was in the hands of another prisoner and that Plaintiff was being taunted and threatened by other prisoners. (Id. at ¶ 53.) Defendant Botello allegedly declined to find and collect Plaintiff's records unless Plaintiff could tell him which prisoner had the records. (Id. at ¶ 54.) Plaintiff also alleges he returned to Defendant Young for assistance, but that she refused to speak with him. (Id. at ¶ 56.) Nineteen days after Plaintiff alleges he initially contacted Defendant Valenzuela for help, the records were returned, apparently by the "officer of the day." (Id. at ¶¶ 60–61.) Several months later, Plaintiff was able to obtain a meeting with Defendant Logan, who was Defendant Young's supervisor. Defendant Logan allegedly apologized for the disclosure of Plaintiff's records and stated that "it should never have happened." (Id. at ¶ 59.)

Plaintiff's claim under 42 U.S.C. § 1983 in his First Amended Complaint ("FAC") argued that releasing and then failing to retrieve the medical file was a cognizable constitutional harm under the Fourteenth Amendment. (FAC ¶¶ 1–2.) Ruling on Defendants' first motion to dismiss, the Court found that disclosure of medical records was a cognizable constitutional harm, but not if the Defendants were simply negligent. (Dkt. No. 31 at 11.) Plaintiff argued in his opposition that the Defendants had acted with "deliberate indifference," a mental state normally associated with Eighth Amendment violations.[1] But the Court found that Plaintiff had not pled facts showing that the Defendants knew of and disregarded a substantial risk of serious harm, as required to meet the "deliberate indifference" standard. (*Id.* at 14.)

Because Plaintiff had not sufficiently pled a constitutional violation, the Court dismissed his First Amended Complaint without addressing whether the right in play was "clearly established," so as to defeat qualified immunity. The Court also did not reach his state claim under the California Constitution's right to privacy. Plaintiff has now filed a Third Amended Complaint ("TAC") alleging causes of action against Defendants Young, Logan, Valenzuela, Nash, and Botello under 42 U.S.C. § 1983 and against CDCR, Cate, Beard, Young, Logan, Valenzuela, Nash, and Botello under the California Constitution. (Dkt. No. 35.)

## II. LEGAL STANDARD

In order to survive a motion to dismiss for failure to state a claim, a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct.

1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir.2000).

## III. DISCUSSION

### A. Section 1983 Claim

"To establish [42 U.S.C.] § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Chudacoff v. Univ. Med. Ctr. of S. Nevada*, 649 F.3d 1143, 1149 (9th Cir.2011). It is not in dispute here that Defendants, as prison officials, acted "under color of state law." Rather, Defendants dispute that Plaintiff has alleged facts showing he was deprived of a "right secured by the Constitution and laws of the United States." (Mot. Dismiss at 5–12.) In the alternative, if there was a constitutional violation, Defendants argue that they are entitled to qualified immunity from suit because the right was not clearly established. (*Id.* at 14.)

#### 1. Constitutional Violations

Plaintiff's TAC makes a claim under 42 U.S.C. § 1983, alleging that his constitutional right to privacy has been violated.

---

1. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

The Court has already found that such a right exists, but that some mental state greater than mere negligence is required to make a constitutional violation cognizable under § 1983. (Dkt. No. 31 at 11.) Plaintiff does not allege that the Defendants acted or failed to act with the *intent* of violating his medical privacy. But in the previous order, the Court found that there was case law supporting the idea that a mental state of "deliberate indifference" to "a substantial risk of serious harm" was enough to state a claim for a Fourteenth Amendment Due Process Clause violation. (*Id.* at 13 (citing *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989))). Although Plaintiff had not, at that time, alleged sufficient facts showing that Defendants actually knew of such a risk, the Court left the door open for Plaintiff to argue that they did in an amended complaint.

The right to medical privacy, though recognized by the Ninth Circuit as a constitutionally protected right,[2] does not always implicate the risk of "serious harm." Often, the chief harm involved will be embarrassment and annoyance. More seriously, in some cases the unauthorized disclosure of medical information might affect a person's insurance rates or their employment prospects. In some extreme cases, the revelation that a person has certain diseases might result in partial or even total social ostracism. But such catastrophic consequences are likely to be rare in civilian life. Thus, it is not surprising that there do not seem to be any medical privacy cases decided on the deliberate indifference standard in the non-prison context.

In the unique context of the disclosure of a prisoner's HIV status, however, the constitutional violation may subject the prisoner to direct acts of violence, which would obviously qualify as "serious harm." As CDCR itself has argued in a slightly different context, knowledge of a prisoner's HIV-positive status can be dangerous for the prisoner, because his fellow prisoners may harbor irrational fears about transmission, however unlikely, and because prisoners cannot simply avoid each other as civilians can. *Gates v. Rowland,* 39 F.3d 1439, 1447–48 (9th Cir.1994). *See also Powell v. Schriver,* 175 F.3d 107, 115 (2d Cir.1999) ("[I]t was ... obvious ... that under certain circumstances the disclosure of an inmate's HIV-positive status ... could place that inmate in harm's way."). The potential danger of violence toward HIV-positive inmates lurks in the background even of cases where courts have found that disclosure of HIV status was not a constitutional violation. *See, e.g., Harris v. Thigpen,* 941 F.2d 1495, 1518 (11th Cir.1991) ("[T]he presence of an intervening defendant class of inmates in this case who oppose the release of HIV-positive prisoners into the general prison population is an indicator of significant opposition that could likely degenerate into active violence within the Alabama system should reintegration occur."); *Muhammad v. Carlson,* 845 F.2d 175, 178 (8th Cir.1988) (segregation of HIV-positive prisoners served legitimate security purpose); *Moore v. Mabus,* 976 F.2d 268, 270–72 (5th Cir.1992) (claim that "guards failed to protect HIV-positive prisoners" survived even where medical privacy claim was deemed

---

**2.** *Doe v. Attorney Gen. of U.S.,* 941 F.2d 780, 795 (9th Cir.1991) *disapproved of as to other matters by Lane v. Pena,* 518 U.S. 187, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (holding that there is a constitutional right to privacy in medical information, including HIV status); *Norman–Bloodsaw v. Lawrence Berkeley Lab.,* 135 F.3d 1260, 1269 (9th Cir.1998) ("The constitutionally protected privacy interest in avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality.").

"frivolous"); *Anderson v. Romero,* 72 F.3d 518, 523 (7th Cir.1995) (suggesting that, irrespective of the medical privacy issue, it would be an Eighth Amendment violation "if employees of the prison, knowing that an inmate identified as HIV positive was a likely target of violence by other inmates yet indifferent to his fate, gratuitously revealed his HIV status to other inmates"). Indeed, in *Harris, Muhammad,* and *Moore,* the right to privacy was breached precisely in order to *protect* HIV-positive patients by isolating them from the general population. That is obviously a very different situation from the allegations here, which suggest that Plaintiff was in danger because word of his HIV status was going around in the general population, of which he remained a part. ·

■ Interpersonal violence, in other words, is "serious harm," and disclosure of HIV-positive status has the unique potential, in the prison context, to result in violence. The Court therefore finds that prison officials' deliberate indifference to the risk of such violence is a sufficient mental state to establish a claim under § 1983 for violation of medical privacy in these circumstances.[3]

■ Plaintiff alleges that prison officials acted with deliberate indifference to a substantial risk of serious harm when they failed to retrieve (or even attempt to retrieve) the itinerant medical file even after Plaintiff explained that it had fallen into the hands of other prisoners and that he was receiving threats based on his HIV status. Defendants Valenzuela, Nash, Botello, and Young allegedly knew of the risk because Plaintiff told each of them, individually, that he was the target of "repeated" "threats." (*Id.* at ¶¶ 47, 51, 53, 56.) Defendants argue that the allegations are not sufficient to establish that Valenzuela, Nash, and Young subjectively knew of the danger, despite having being told of it. (Mot. Dismiss at 9–10.) The Court disagrees. The allegation that Valenzuela dismissed Plaintiff's concerns by saying that "it's a legal matter" does not negate the fact that she was personally told of a risk of violence to Plaintiff. Nash and Young were also personally told of the risk. While the actual state of mind of Valenzuela, Nash, and Young is ultimately a question for a jury, Plaintiff's allegations raise a plausible inference that Defendants knew of the risk. Plausibility is all that is required at the pleading stage. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

■ Defendants also contend that Defendant Botello could not have had the requisite deliberate indifference because the records were returned two days after Plaintiff met with Botello about his records, and because the TAC states that Botello was the only officer who "attempted to retrieve the records." (Mot. Dismiss at 10.) But the TAC specifically says that the records were initially acquired by "the 'officer of the day' in Joshua Hall," not by Botello. (TAC, ¶ 60.) · There is no indication that Defendant Botello took any affirmative steps to secure the records prior to that point. Indeed, Plaintiff alleges that

---

**3.** The Court here follows the logic of *Wood* and its progeny, which firmly establish that state officers have an affirmative duty to protect people from danger when state action has placed them in peril in the first place. *See also Maxwell v. Cnty. of San Diego,* 708 F.3d 1075, 1082 (9th Cir.2013); *Kennedy v. City of Ridgefield,* 439 F.3d 1055, 1061 (9th Cir.2006) *Munger v. City of Glasgow Police Dep't,* 227 · F.3d 1082, 1086 (9th Cir.2000). Although Plaintiff has framed the issue slightly differently, as a matter of medical privacy, the logic of the "danger creation" cases would seem to apply equally well to this particular kind of privacy violation: state officers simply may not act with deliberate indifference to the risks of serious harm created by state action.

Botello's initial response was a refusal to help Plaintiff unless Plaintiff first undertook an investigation in a part of the prison he had no access to. (*Id.* at ¶¶ 54, 62.) The TAC therefore raises a plausible inference of deliberate indifference on Botello's part.

■ As to Defendant Logan, however, the Court agrees with Defendants that the allegations in the TAC do not show that she violated Plaintiff's constitutional rights. Plaintiff's primary complaint with regard to Defendant Logan is that she did not meet with him right away. Assuming that an earlier meeting with Logan would have been useful in retrieving Plaintiff's records and reducing the risk of violence, it is not clear that Defendant Logan understood before their meeting that Plaintiff had been threatened with harm. Plaintiff alleges only that he "had reported" threats generally, not that he had communicated the threats to Logan in his attempts to schedule a meeting with her. (*Id.* at 59.) Therefore, although Defendant Logan may have been somewhat negligent in waiting four months to respond to Plaintiff's request for a meeting, it cannot be said on these allegations that she acted with deliberate indifference.

Plaintiff has alleged sufficient facts to state a § 1983 claim for a constitutional violation as to Defendants Valenzuela, Nash, Young, and Botello. The claim is dismissed, however, as to Defendant Logan.

### 2. Qualified Immunity

■ Defendants assert qualified immunity as a defense. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Thus, the question here is whether Defendants violated a clearly established constitutional right.

Defendants urge the Court to find that, even if Plaintiff had a right to privacy in his medical information (and especially his HIV-positive status), the right against disclosure under these circumstances was not "clearly established" at the time his file was left in the hands of other inmates. The Court rejects that argument. The right to medical privacy is clearly established.[4] Although that right is heavily circumscribed in prison,[5] it is also clearly

4. *Nelson v. Nat'l Aeronautics & Space Admin.,* 530 F.3d 865, 877 (9th Cir.2008) *rev'd as to other matters,* 562 U.S. 134, 131 S.Ct. 746, 178 L.Ed.2d 667 (2011) ("We have repeatedly acknowledged that the Constitution protects an individual interest in avoiding disclosure of personal matters. This interest covers a wide range of personal matters, including . . . medical information. . . ."); *Tucson Woman's Clinic v. Eden,* 379 F.3d 531, 551 (9th Cir. 2004) ("Individuals have a constitutionally protected interest in avoiding 'disclosure of personal matters,' including medical information."); *Doe v. Attorney Gen. of U.S.,* 941 F.2d 780, 795 (9th Cir.1991) *disapproved of as to other matters by Lane v. Pena,* 518 U.S. 187, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (holding that there is a constitutional right to pri-

vacy in medical information, including HIV status). *See also Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994) ("Individuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition."); *Doe v. Delie,* 257 F.3d 309, 331 (3d Cir.2001) ("[W]e have recognized the right to confidentiality in medical records since 1980.").

5. *See, e.g., Seaton v. Mayberg,* 610 F.3d 530, 534 (9th Cir.2010) ("To the extent that his constitutional claim attacks disclosure while he was in prison serving his sentence *and for a penological purpose relating to his imprisonment,* Seaton's claim falls within the body of law regarding privacy for prisoners, the general principle being that whatever privacy

established that "a prison inmate retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Turner v. Safley*, 482 U.S. 78, 95, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). A reasonable prison official thus would have been on notice that he or she could not violate Plaintiff's right to medical privacy absent some legitimate penological objective. Defendants have not even attempted to show that their refusal to try to retrieve the record (or otherwise mitigate the potentially dangerous effects of the disclosure) was related to such an objective. Finally, as discussed in note 3, *supra*, it is clearly established that state officials may not act or fail to act with deliberate indifference to dangers created by state action. Thus, although Defendants are correct that there does not appear to be a Ninth Circuit case with facts identical to this one, the Court finds that the above principles all apply to this situation and were clearly established.

The Court finds that the Defendants do not have a defense of qualified immunity in this case.

## B. California Constitutional Right To Privacy Claim

Plaintiff alleges that the Defendants violated his constitutional right to privacy. Cal. Const. art. I, § 1. Because Plaintiff had not pled sufficient facts to establish his § 1983 claim in the FAC, the Court did not consider his California constitutional claim in the previous order and addresses it here for the first time.

### 1. Government Claims Act Immunity

■ Defendants, as a threshold matter, assert governmental immunity "afforded to public entities and employees through the Government Claims Act (Cal. Gov't Code § 810 et seq.)." (Mot. Dismiss at 17:12–13.) Although statutes generally do not trump constitutional provisions, Defendants cite to two cases for the proposition that statutory immunity does trump the constitutional right to privacy under California law.

In *Jacob B. v. Cnty. of Shasta*, the California Supreme Court held that the litigation privilege embodied in Cal. Civil Code § 47(b) protected parties against causes of action rooted in the state constitutional right to privacy with regard to publications made in connection with a judicial proceeding. 40 Cal.4th 948, 56 Cal.Rptr.3d 477, 154 P.3d 1003 (2007). The court noted that the constitutional right to privacy was subject to interest-balancing, *id.* at 961, 56 Cal.Rptr.3d 477, 154 P.3d 1003, and that the interests safeguarded by the litigation privilege were important enough to outweigh the right "not on a case-by-case basis but in all cases." *Id.* at 962, 56 Cal.Rptr.3d 477, 154 P.3d 1003.

The *Jacob B.* court observed that the litigation privilege had existed for "well over a century," and had been applied as a nearly absolute privilege at least since 1956. *Id.* at 961, 56 Cal.Rptr.3d 477, 154 P.3d 1003. The court was "not aware of[ ] anything in the ballot materials or history of the 1972 initiative that added the constitutional right to privacy that suggested any intent to limit the scope of this preexisting privilege." *Id.* Thus, the court declared that "[w]hen the voters adopted California Constitution, article I, section 1, they did so mindful of the preexisting litigation privilege." *Id.* And in concluding that courts did not need to conduct interest-balancing on a case-by-case basis when it came to the litigation privilege, the court held that "[i]n adopting the litigation privi-

---

right he has may be overridden *for legitimate penological reasons."* ) (emphases added).

lege, the *Legislature* has already done the balancing." *Id.*

These conclusions suffer from some logical shortcomings. If the ballot materials did not mention the litigation privilege, it seems more reasonable to assume that California voters were *not* mindful of it. And it is particularly hard to see how the Legislature, in statutorily codifying the litigation privilege in 1872, could have adequately considered a constitutional privacy interest not created until a century later. Nonetheless, the court's opinion is clear, and California law is settled as to the effect of Cal. Civil Code § 47 on the constitutional privacy.

But one California Court of Appeals has gone further, relying on *Jacob B.* and holding broadly that "[t]he constitutional right to privacy does not limit the scope of a preexisting statutory immunity," including immunity under the provisions of the Government Claims Act ("GCA"). *Richardson–Tunnell v. Sch. Ins. Program for Employees (SIPE)*, 157 Cal.App.4th 1056, 1066, 69 Cal.Rptr.3d 176 (2007). The court there noted that "[t]he voter information materials for the 1972 initiative demonstrate the intent to restrain 'governmental snooping' and compilation of 'cradle to grave' 'dossiers of American citizens.' The restraint on governmental snooping is accomplished by the availability of injunctive relief for invasion of privacy." *Id.* (citation omitted).

With due respect for the Court of Appeals as an expositor of California law, this Court disagrees. First, the *Richardson–Tunnell* court does not explain *how* injunctive relief alone is supposed to restrain governmental misuse of private information, given that in many cases, this one included, an injunction would be moot by the time the case was fully litigated. Second, the court's cursory citation to a few words in the voter information pamphlet does not explain how providing government agencies or employees a blanket immunity to constitutional tort liability would further article I, § 1's broader policy goals. The amendment to the California Constitution was not intended solely to prevent "government snooping" or the creation of "dossiers." As proponents of the amendment explained, the ability to "control circulation of personal information" is "essential to social relationships and personal freedom." California Secretary of State, Ballot Pamphlet 26, 27 (November 1972), *available at* http://repository.uchastings.edu/cgi/viewcontent.cgi?article=1761&context=ca_ballot_props. That the amendment was designed to reach "private businesses" as well as the government shows that the scope of concerns motivating the amendment was broader than mere government monitoring. *Id. See also White v. Davis*, 13 Cal.3d 757, 775, 120 Cal.Rptr. 94, 533 P.2d 222 (1975) (finding in the legislative history at least four "mischiefs" the amendment was intended to address, including "the improper use of information properly obtained for a specific purpose, for example . . . *the disclosure of it to some third party*") (emphasis added). Moreover, while proponents acknowledged that the right embodied in the amendment was not absolute, they saw its reach as being limited by "compelling public necessity." Ballot Pamphlet at 28. The *Jacob B.* court explained the unusually important policy considerations surrounding the litigation privilege, which probably supported an implicit finding of compelling necessity in that narrow context.[6] But neither the *Richard-*

---

6. "The litigation privilege furthers the vital public policy of affording free access to the courts and facilitating the crucial functions of the finder of fact. This policy exists even if a privacy cause of action invokes the Constitution . . . The same compelling need to afford

son–*Tunnell* court nor Defendants have explained what compelling public necessity is served by giving government actors broad immunity from constitutional claims for damages.[7]

While the Court is bound by the California Supreme Court's holding in *Jacob B.*, it is not bound by *Richardson–Tunnell*, and it comes to a different conclusion as to the statutory immunities provided by the GCA. Defendants are not entitled to a defense of statutory immunity.[8]

## 2. Elements of a Constitutional Right to Privacy Claim

■ To establish a claim for violation of the right to privacy under article I, § 1, a plaintiff must establish "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal.4th 1, 39–40, 26 Cal.Rptr.2d 834, 865 P.2d 633 (1994).

■ The parties apparently agree, and so does the Court, that this case turns on the third prong-whether Defendants' conduct constituted a serious invasion of privacy. (Mot. Dismiss at 15; Opp'n at 10; Reply at 7.) To be "serious," the invasion must constitute an "egregious breach of the social norms underlying the privacy right." *Hill*, 7 Cal.4th at 37, 26 Cal. Rptr.2d 834, 865 P.2d 633. Plaintiffs must show more than an intrusion upon reasonable privacy expectations. "Actionable invasions of privacy also must be 'highly offensive' to a reasonable person...." *Hernandez v. Hillsides, Inc.*, 47 Cal.4th 272, 295, 97 Cal.Rptr.3d 274, 211 P.3d 1063 (2009).

Because the intrusion on privacy must be egregious and highly offensive, an accidental disclosure (of the kind that is inevitable when human beings process large amounts of information) is not necessarily sufficient to sustain a claim under article I, § 1. The Northern District of California has stated, for example, that "[e]ven negli-

free access to the courts exists whatever label is given to a privacy cause of action." *Jacob B.*, 40 Cal.4th at 962, 56 Cal.Rptr.3d 477, 154 P.3d 1003 (citations and internal quotation marks omitted).

7. At least one California appellate court, albeit pre-*Jacob B.*, has explicitly recognized that the constitutional tort is not necessarily subject to the same limitations as other privacy torts: "The [ballot pamphlet] indicates that the interests traditionally embraced by the tort of invasion of privacy now come within the protection of article 1, section 1, although *the limits of the tort cause of action do not necessarily represent limits to an action taken for violation of the constitutional right.*" *Urbaniak v. Newton*, 226 Cal.App.3d 1128, 1137, 277 Cal.Rptr. 354 (1991) (emphasis added).

8. Even if there were statutory immunity, it is doubtful that it would protect the individual Defendants here. Defendants assert immunity under Cal. Gov't Code § 820.8, which provides public employees immunity from liability for the acts of others. Defendants' theory

is that § 820.8 protects Cate and Beard from liability under respondeat superior and protects the other Defendants from liability for the actions of Plaintiff's fellow inmates. But Cate and Beard are not being sued under a respondeat superior theory; they are being sued for allegedly failing to create adequate procedures and failing to properly train prison staff. As to the other Defendants, by its plain language § 820.8 does not "exonerate[ ] a public employee from liability for injury proximately caused by his own negligent or wrongful act or omission." This is true even where other persons are the direct cause of the injury, if their actions are a clearly foreseeable consequence of the public employee's act or omission. *See Roberts v. California Dep't of Corr.*, No. 2:13–CV–07461–ODW JC, 2014 WL 1308506, at *3 (C.D.Cal. Apr. 1, 2014) (section 820.8 does not shield a corrections officer who gives hostile prisoners access to another prisoner's cell knowing that they are likely to stab him).

gent conduct that leads to theft of highly personal information, including social security numbers, does not approach the standard of actionable conduct under the California Constitution...." *In re iPhone Application Litig.,* 844 F.Supp.2d 1040, 1063 (N.D.Cal.2012).

On the other hand, public policy concerns may counsel setting a lower threshold for "egregious violations of social norms" when it comes to certain types of information. So, for example, article I, § 1 prohibits disclosure of medical information, including HIV status, because disclosure can "subvert a public interest favoring communication of confidential information" to medical personnel, both for treatment purposes and for their own safety. *Urbaniak v. Newton,* 226 Cal. App.3d 1128, 1140, 277 Cal.Rptr. 354 (1991). Public policy is sometimes embodied in statutes, *Lloyd v. Cnty. of Los Angeles,* 172 Cal.App.4th 320, 329, 90 Cal. Rptr.3d 872 (2009), and there is a California statute on point here. California Health & Safety Code § 120980(c) imposes criminal penalties on anyone negligently disclosing the results of an HIV test if the disclosure "results in economic, bodily, or psychological harm to the subject of the test". A breach of privacy serious enough to support criminal charges is, almost by definition, an egregious violation of social norms. Thus, even negligent disclosure of HIV-positive status can be an egregious violation of social norms if it causes harm—including psychological harm—to the patient. Here, Plaintiff alleges that he experienced "humiliation, fear, embarrassment ... mental anguish, and suffering," as well as the threat of bodily harm from other prisoners. (TAC ¶ 84.) Plaintiff's allegations are sufficient to plausibly describe an egregious breach of social norms.

Because even the allegation of a negligent disclosure can sustain an article I, § 1 claim for breach of privacy under these circumstances, allegations of a deliberately indifferent failure to attempt to retrieve the missing records must, *a fortiori,* sustain a claim as well.

Plaintiff has stated a claim for breach of privacy in violation of the California Constitution, and the Motion to Dismiss is denied as to this claim.

### C. Punitive Damages

■ Defendants argue that Plaintiff's request for punitive damages should be stricken because Plaintiff has not alleged either "evil motive" or a "reckless and callous indifference to federally protected rights." (Mot. Dismiss at 19.) Plaintiff, however, argues that a finding of deliberate indifference to a substantial risk of serious harm is the same thing as a finding of callous indifference to a constitutional right. (Opp'n. at 13.) Defendants do not take the matter up further in their Reply.

Plaintiff's equivalence is not self-evidently correct. One can be indifferent to a risk of harm without necessarily being indifferent to a constitutional right. Nonetheless, in *Smith v. Wade,* the Supreme Court affirmed a punitive damages award in a case where the district court instructed the jury that such damages could only be awarded on a finding of "reckless or callous disregard of, or indifference to, the rights *or safety* of others." 461 U.S. 30, 33, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (emphasis added). The Court repeated the district court's "safety" language in its own opinion, explaining why a recklessness standard for punitive damages does not undermine the qualified immunity of corrections officers: "The very fact that the privilege is qualified reflects a recognition there is no societal interest in protecting those uses of a prison guard's discretion

that amount to reckless or callous indifference to the rights *and safety* of the prisoners in his charge." *Id.* at 55, 103 S.Ct. 1625 (emphasis added). Thus, *Smith* seems to suggest that reckless indifference to safety also supports an award of punitive damages.

 "Before a motion to strike is granted the court must be convinced that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or defense succeed." *RDF Media Ltd. v. Fox Broad. Co.,* 372 F.Supp.2d 556, 561 (C.D.Cal.2005). Plaintiff alleges that Defendants acted with deliberate indifference to a substantial risk to his safety, and his allegations could also give rise to an inference of indifference to his rights. Given the Court's reading of *Smith* and the possibility that it will be shown that Defendants acted with reckless disregard for Plaintiff's rights or safety or both, the Court cannot say at this point that there is no set of circumstances under which Plaintiff's claim to punitive damages could succeed. The motion to strike is denied.

### D. Declaratory Judgment

Defendants also move to strike Plaintiff's request for "an order Declaring Defendants conduct unconstitutional." (TAC, "Request for Relief," ¶ 2.) Plaintiff notes that a finding of unconstitutionality is "an element of Plaintiff's first cause of action," (Opp'n at 15:7–8), and the Court therefore interprets the request as, essentially, an elaboration of the prayer for judgment.

### IV. CONCLUSION

For the above reasons, the Court GRANTS the Motion to Dismiss as to the claims against Defendant Logan and DE-NIES the motion as to all other Defendants.

IT IS SO ORDERED.